EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Omar Vélez Bonilla<br><br>Recurrido | Certiorari<br><br>2013 TSPR 121<br><br>189 DPR ____ |

Número del Caso: CC-2012-372

Fecha: 30 de octubre de 2013

Tribunal de Apelaciones Región Judicial de Ponce

Oficina del Procurador General:

> Lcdo. Luis Román Negrón
> Procurador General
>
> Lcdo. Ricardo Alegría Pons
> Procurador General Auxiliar

Abogada de la Parte Recurrida:

> Lcda. Ana Rosa Montes Arraiza
> Sociedad para la Asistencia Legal

Materia: Procedimiento Criminal – Descubrimiento de prueba imposibilidad de producir prueba potencialmente exculpatoria; procedimientos para determinar si procede desestimación de la acusación por el Estado no proceder descubrir evidencia no disponible

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

   Peticionario

     v.                 CC-2012-372     Certiorari

Omar Vélez Bonilla

   Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 30 de octubre de 2013.

> *Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.*[1]

La justicia demanda la verdad porque precisa de ella para manifestarse. "Baste recordar que el propósito del juicio no es obtener una convicción, sino la depuración de hechos en búsqueda de la verdad".[2] De ahí, que el debido

---

[1] California v. Trombetta, 467 U.S. 479, 486 (1984).

[2] Pueblo v. Rodríguez Sánchez, 109 DPR 243, 247 (1979); Pueblo v. Delgado López, 106 D.P.R. 441. (1977).

proceso de ley constitucional exija que el acusado tenga la oportunidad de examinar con tiempo suficiente, no sólo la prueba que obra en su contra -en vías de impugnarla-, sino aquella que obra a su favor, sea sustantiva o para impugnación.[3]

Por eso, reiteradamente y en variadas circunstancias hemos señalado que cuando el Estado falla en descubrir evidencia que resulta material y exculpatoria, el debido proceso de ley exige inimpugnablemente la celebración de un nuevo juicio.[4]

Pero, ¿qué ocurre cuando la prueba que el Estado falla en descubrir no puede clasificarse como exculpatoria, sino que meramente tenía el **potencial** de serlo? Esa es la controversia que nos ocupa en esta ocasión.

## I

Los hechos de este caso están muy bien expuestos en la sentencia de la cual se recurre, por lo que pasamos a reproducirlos casi en su totalidad. El 9 de agosto de 2010 el Sr. Saúl García Batista trabajaba como cajero de la gasolinera JJG Service Station en Yauco. A eso de las diez de la noche, alegó el señor García Batista que mientras cuadraba la caja registradora, un individuo se le acercó y le compró una cajetilla de cigarrillos y una

---

[3] U.S. v. Bagley, 473 U.S. 667 (1985); Giglo v. United State, 405 U.S. 150 (1977).

[4] Pueblo v. Arzuaga, 160 D.P.R. 520 (2003); Pueblo v. Hernández Santana, 138 D.P.R. 577 (1995); Pueblo v. Hernández García, 105 D.P.R. 506 (1974).

Coca Cola. A los pocos minutos, la misma persona regresó armada con una pistola y le exigió que le entregara el dinero de la caja registradora y que no se moviera. Luego de un minuto o minuto y medio, el individuo alegadamente se marchó con más de dos mil dólares producto del asalto y abordó un vehículo Nissan Altima gris "charcoal" con tablilla HND115.

Mientras el individuo se marchaba en el vehículo, el señor García Batista señaló que lo observaba a través del sistema de cámaras de seguridad. Acto seguido, el empleado abordó su vehículo, una guagua del 1987, y persiguió el Nissan Altima que alegadamente fue abordado por el asaltante. Durante la marcha, el cajero impactó el Nissan Altima con su guagua por la parte trasera, por lo que el asaltante hizo cuatro disparos desde su ventana. Luego, el cajero perdió de vista el vehículo del asaltante mientras se alejaba en dirección hacia Sabana Grande; entonces desistió de la persecución.

Posteriormente, la Policía de Puerto Rico identificó en el Municipio de Yauco el Nissan Altima gris con tablilla HDN115 en el que presuntamente escapó el asaltante y que fue impactado por la parte trasera, según descrito la noche de los hechos por el señor García Batista. Acto seguido se arrestó al ocupante del mismo. A los ocho días después de la noche de los hechos, en una rueda de detenidos el señor García Batista identificó al Sr. Omar Vélez Bonilla (recurrido) como el asaltante. Ese mismo día, el Ministerio Público presentó tres denuncias

contra el recurrido por el delito de robo[5] y las otras dos por infracciones a la Ley de Armas.[6]

Habiéndole encontrado causa probable para arresto y presentadas las denuncias en su contra, el 31 de agosto de 2010 el recurrido presentó una *Moción solicitando orden* en la cual alegó la existencia de prueba exculpatoria consistente en videocintas del día de los hechos y solicitó el auxilio del tribunal para la presentación de dicha evidencia. En esa moción, el recurrido no argumentó en qué medida el vídeo requerido constituía prueba exculpatoria y mucho menos sobre cuál sería su importancia o alcance.

El 1 de septiembre siguiente se celebró la vista preliminar. De la resolución correspondiente surge que el Tribunal de Primera Instancia (TPI) tomó conocimiento de la solicitud presentada por el recurrido. El Ministerio Público, por su parte, formuló su oposición a dicha solicitud, alegando, en síntesis, que el vídeo al cual se hacía referencia no contenía prueba exculpatoria, sino prueba que corroboraba la conexión del imputado con los delitos por los cuales se le denunció. Además, manifestó que no utilizaría ese vídeo durante la vista preliminar. En esa ocasión el agente Ricardo Pontón Cruz (el agente Pontón), testigo de cargo, informó que el vídeo en

_____

[5] Art. 198 del Código Penal de Puerto Rico de 2004, 33 L.P.R.A. sec. 4826.

[6] Arts. 5.04 y 5.15 de la Ley Núm. 404-2000, 25 L.P.R.A. secs. 458c y 458n.

cuestión no fue grabado por la Policía de Puerto Rico, sino que se trataba de una grabación producto del sistema de seguridad de la gasolinera. Explicó que, como parte de la investigación, hizo una regrabación del vídeo en un dispositivo removible ("USB"), pero que no había podido reproducirlo en su oficina, por lo que no estaba disponible para ser entregado al tribunal.

Luego de haber escuchado los alegatos de las partes, el TPI denegó la solicitud del recurrido. Fundamentó su determinación al destacar las particularidades de la vista preliminar al amparo de las Reglas 23 y 95 de las Reglas de Procedimiento Criminal, a saber, que en la etapa de vista preliminar el Fiscal solo viene obligado a presentar aquella prueba que establezca un caso *prima facie* contra el acusado, que no existe el derecho a descubrimiento de prueba por parte del imputado, salvo las declaraciones juradas de los testigos que allí declararon y circunstancias especiales del debido proceso de ley. Además, expresó que le correspondía a la Defensa poner al tribunal en condiciones de determinar si el vídeo en cuestión realmente era prueba exculpatoria.[7]

---

[7] Según expresó el foro primario en su Resolución del 1 de septiembre de 2010, "[e]n el caso que nos ocupa, la defensa se limitó a exponer que el Ministerio Público debió entregarle el vídeo en su poder porque el mismo poseía prueba exculpatoria; sin embargo, no argumentó en qué medida este vídeo constituía prueba exculpatoria, así como tampoco sobre la importancia y el alcance de lo que podía evidenciar el vídeo. La defensa no ha demostrado con especificidad su argumento sobre la prueba exculpatoria. Una simple alegación general no rebate las exigencias procesales en la etapa de vista

Así el trámite, el 10 de septiembre de 2010 el Ministerio Público presentó las acusaciones correspondientes. Al día siguiente, el recurrido presentó la estilada *Moción en razón de Regla 95 de las de Procedimiento Criminal y el Debido Procedimiento de Ley.* Como parte de los requerimientos, solicitó <u>toda fotografía y/o vídeo que tenga en su poder el Ministerio Público o la Policía tomada como resultado de o relacionada con el caso de epígrafe</u>.

El 18 de octubre de 2010 se celebró una vista en la que se discutieron las mociones presentadas por las partes. En esta, el Ministerio Público informó que tenía el vídeo y que harían las gestiones necesarias para que se trajera el equipo para poder verlo, ya que no lo habían podido reproducir en la oficina.

El 29 de octubre de 2010 la Defensa presentó una *Moción informativa y solicitando remedios,* en la cual reiteró que el Ministerio Público no le había entregado copia del vídeo de las cámaras de seguridad de la gasolinera, el cual calificó como esencial para la defensa del recurrido, y solicitó el auxilio del tribunal para que le ordenara entregárselo. Nuevamente, en dicha moción el recurrido no argumentó en qué medida el vídeo requerido constituía prueba esencial para su defensa y mucho menos sobre cuál sería su importancia o alcance.

---

preliminar, ni puede escaparse de la limitación establecida en las Reglas de Procedimiento Criminal y su jurisprudencia interpretativa". Apéndice de la Petición de *certiorari*, pág. 34.

Ese día, la Defensa también presentó una *Moción al amparo del Debido Proceso de Ley e Impugnando el Procedimiento de Identificación.* En la misma resumió el testimonio del señor García Batista, y cuestionó el arresto y la posterior identificación del recurrido por parte de este. Sin embargo, nuevamente en esa moción el recurrido no mencionó el referido vídeo, a pesar de que, según alegaba, su contenido constituía prueba exculpatoria.

El 12 de noviembre de 2010 la Defensa presentó una *Moción informativa urgente y solicitando remedios.* En la misma hizo constar la entrega de dos discos compactos (CD's) por parte del Ministerio Público y las gestiones infructuosas para poder ver su contenido. En esa moción, el recurrido advirtió que desde la vista preliminar estuvo requiriendo el auxilio del tribunal de instancia para examinar el vídeo del día de los hechos. Sin embargo, a pesar de lo anterior, nuevamente el recurrido no argumentó en qué medida el requerido vídeo constituía prueba exculpatoria y mucho menos cuál sería su importancia o alcance.

Ese mismo día, el Ministerio Público presentó una *Oposición a la Moción al Amparo del Debido Proceso de Ley e Impugnando Procedimiento de Identificación.* Alegó, en síntesis, que el criterio de que la validez de una identificación sea a la luz de la totalidad de las circunstancias se cumplió en este caso, que el señor

García Batista identificó al recurrido mediante rueda de detenidos y que dicho procedimiento no fue sugestivo.

Así las cosas, el 23 de noviembre de 2010 se celebró una vista en la cual la Defensa indicó que no podía ver el vídeo según entregado por el Ministerio Público. En esa ocasión, el Fiscal se comprometió a verificar si en su propia computadora se podía ver el contenido de los CD entregados a la Defensa. Según la discusión de la vista, el tribunal ordenó nuevamente al Ministerio Público a hacer las gestiones necesarias para reproducir el vídeo a la Defensa.

El 10 de diciembre de 2010 se celebró otra vista, en la cual se volvió a atender el asunto del vídeo. En esta ocasión la Defensa informó que ni siquiera el técnico de computadoras del tribunal pudo reproducir el vídeo, y que este era necesario para la vista de supresión de identificación.

El 20 de enero de 2011 la Defensa presentó una *Moción Urgente Solicitando Orden, e Informativa y sobre otros extremos.* Sostuvo que luego de innumerables gestiones e intentos fútiles, no habían logrado acceso al vídeo del día de los hechos. Arguyó que al no tener acceso a dicha prueba, la cual calificó como exculpatoria, procedía la desestimación de los cargos contra el recurrido. En esa ocasión nuevamente el recurrido catalogó el vídeo de exculpatorio, pero no dio detalle alguno en torno a su alcance o valor exculpatorio.

El 28 de enero de 2011, se celebró una vista y la Defensa informó que, a pesar de todas las gestiones, aún no habían podido ver el contenido del vídeo. Por su parte, alegó que el vídeo era esencial para la defensa y que, de entender que era exculpatorio, solicitaría que el tribunal lo examinara. De la misma forma, informó que había acordado acudir con el agente Pontón a la gasolinera a intentar ver el vídeo desde el dispositivo "USB" del agente. El agente indicó que la cinta del establecimiento se había borrado, por lo que tenía que verificar si se podía ver desde la copia que había realizado.

El 2 de marzo de 2011, la Defensa informó al tribunal sobre las gestiones realizadas hasta el momento y que estas habían sido infructuosas. El dueño de la gasolinera manifestó que no podían ver el vídeo en el equipo del local porque había ocurrido otro asalto y entendía que se podía borrar el vídeo de este último incidente. Conscientes de que las cámaras de seguridad del local borraban a los 30 días, el tribunal citó al agente Pontón para que acudiera con su "USB" a la gasolinera para ver si se podía reproducir el vídeo desde el dispositivo.

Según ordenado, el 23 de marzo de 2011 las partes acudieron al tribunal junto al agente Pontón, y allí se les ordenó comparecer a la gasolinera ese mismo día para ver el vídeo desde el equipo del local. Al día siguiente, la Defensa presentó una *Moción Incluyendo Documentos*

*(Regla 95-A)* en la que informó que no pudieron ver el vídeo en la gasolinera, y que había acordado con el Fiscal para que este se llevara el "USB" al Instituto de Ciencias Forenses para que un especialista intentara extraer el vídeo.

En la vista de supresión de identificación celebrada el 27 de abril de 2011, la Defensa informó que llevaba desde la etapa de vista preliminar solicitando el vídeo y que aún no había tenido oportunidad de verlo. Por otra parte, el Ministerio Público expresó que estaba imposibilitado de reproducir el vídeo, y que estaba esperando por los resultados del Instituto de Ciencias Forenses.

En esa ocasión el Tribunal determinó que la *Moción de Supresión de Identificación* no tiene nada que ver con el vídeo y que esta ni lo mencionaba. Por ello, entendió que no se debía postergar más la vista esperando por el vídeo. A su vez, el TPI ordenó que si se lograba reproducir el vídeo, la Defensa tendría derecho al mismo. La Defensa contestó que el vídeo era necesario porque la intervención que se hace con su cliente estuvo basada en un número de tablilla que anotó un testigo, que intervino con la persona que estuvo conduciendo el vehículo, y alegó que la esencia de la supresión era si se veía o no a la persona porque la situación fue muy rápida. Entonces, el TPI determinó que en cuanto a discusión sobre la supresión de identificación, se presumiría que el vídeo no mostraba la tablilla del vehículo. Esto,

haciendo la salvedad de que tal determinación podría variar una vez las partes le presentara evidencia a estos efectos.

El 11 de mayo de 2011, la defensa presentó una *Moción al Amparo del Debido Proceso de Ley y Solicitando Desestimación* en la que esbozó el derecho aplicable en torno a prueba exculpatoria y reseñó jurisprudencia norteamericana en la cual se atiende una situación muy similar a la de autos.

Nuevamente, el 13 de mayo de 2011, la Defensa presentó una *Moción Informativa* solicitándole al tribunal de instancia que tomara conocimiento de que en ese día habían comparecido a Fiscalía y le había hecho entrega de los dos CD que habían recibido por parte del fiscal, a los fines de que fueran examinados por el perito del Instituto de Ciencias Forenses (ICF).

El 18 del mismo mes y año se celebró una vista para dilucidar el asunto del vídeo. En esta, el Ministerio Público informó que no tenía el vídeo solicitado, toda vez que el sistema de seguridad de la gasolinera tiene una duración de treinta días y pasado ese tiempo lo grabado en el vídeo no se retiene. Además, informó que la Sección de Evidencia Digital y Multimedios del ICF indicaba que no se podía recuperar el vídeo del CD; que había un vídeo captado en el "pen drive" del Agente Pontón, pero que, después de haberle hecho una foto secuencia, dicho vídeo correspondía a los hechos de otro caso. El TPI por su parte, reconsideró las expresiones

sobre la vista del 27 de abril de 2011 y mencionó jurisprudencia norteamericana que atiende la situación en la que una evidencia crítica para la defensa del acusado, que fue solicitada a tiempo, no se produzca por el Estado. Por ello, concedió un término de 15 días al Ministerio Público para replicar a la *Moción de Desestimación*.

El 15 de junio de 2011 el Ministerio Público presentó su oposición a la segunda moción de desestimación. Alegó, en síntesis, que las imágenes de las cámaras de seguridad en cuestión nunca habían estado disponibles al Ministerio Público ni a la Defensa, por lo que les llamó la atención que la Defensa alegara que se trataba de prueba exculpatoria. Señaló, además, que la centralidad de las imágenes de las cámaras de seguridad era mínima porque había un testigo presencial de los hechos y no debían ser penalizados con la desestimación del caso cuando había una imposibilidad física de producir las imágenes.

Así el trámite, el 27 de junio de 2011 el TPI celebró una vista para considerar la solicitud de supresión de identificación. Surge del acta de la vista que el tribunal de instancia acogió el planteamiento del recurrido, pues determinó que la no disponibilidad de los vídeos impidió a la Defensa presentar su caso de una manera adecuada. El tribunal concluyó, además, que era esencial para cumplir con el requerimiento del debido proceso de ley el que los vídeos estuviesen disponibles

para la Defensa. En vista de lo anterior, el Tribunal de Primera Instancia desestimó el caso. Ahora bien, surge del expediente que el foro primario fundamentó su determinación en dos casos de la jurisprudencia federal. Así lo expresa el acta de la vista del 27 de junio de 2011, en la cual se señala lo siguiente:

> Luego del Tribunal escuchar los argumentos tanto de la Defensa como el Ministerio Público; y de acuerdo a lo que señala la Defensa en su Moción sobre la jurisprudencia en los casos del norte, People vs North Worth, Brady vs Maryland. Estos casos resuelven juicios en su fondo donde se ha informado que la no disponibilidad de cierta evidencia, en particular de ciertos vídeos en poder de la Policía, ya sea por causa intencional o negligencia, se resuelve que si estos vídeos fueron materiales para que la Defensa pudiera presentar su cas[o] de forma adecuada, es una violación al debido proceso de ley.[8]

Finalmente, el 27 de octubre de 2011, el TPI emitió su resolución por escrito en la que concluyó lo siguiente:

> El deber de preservar evidencia material es parte del deber de producirla. A pesar que en el caso de epígrafe el tribunal declaró No Ha Lugar la producción de la vídeocinta para la etapa de la vista preliminar, dicho pedido en etapa de supresión de evidencia debe declararse Ha Lugar, pues la no disponibilidad por causas atribuibles al estado de una vídeocinta que alegadamente capta los hechos que motivan los cargos de epígrafe niegan el debido proceso de ley del acusado.[9]

Inconforme, el Ministerio Público presentó un recurso de *certiorari* ante el Tribunal de Apelaciones en

---

[8] Apéndice de la Petición de *certiorari*, pág. 23.

[9] Apéndice de la Petición de *certiorari,* pág. 28.

el que, en lo pertinente y en síntesis, planteó que había errado el foro de instancia al concluir que la cinta de vídeo contenía evidencia exculpatoria *per se*. No obstante, el Tribunal de Apelaciones denegó la expedición del recurso. En su sentencia, y después de hacer un extenso recuento de la doctrina relacionada a la importancia del proceso de identificación, el foro apelativo intermedio dispuso como sigue:

> En el recurso ante nuestra consideración, el Ministerio Fiscal no descubrió al recurrido el vídeo de las cámaras de seguridad de la gasolinera. Fundamentó su contención en la imposibilidad física para descubrirlo. A la luz de lo anterior, el TPI desestimó el caso contra el recurrido....
> ........
>
> Luego de evaluar la totalidad del expediente ante nuestra consideración, y habiéndose confirmado la negligencia del Estado para preservar dicho vídeo, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no vemos motivo para intervenir con la determinación del foro primario.[10]

Ante la denegatoria del Tribunal de Apelaciones de expedir el recurso, el Ministerio Público recurrió ante este Tribunal mediante recurso de *certiorari*, el cual expedimos. Los errores planteados en el recurso son los siguientes:

1. Incidió el Tribunal de Apelaciones al inferir sin ninguna prueba que lo sustentara, que la cinta de vídeo tomada de la cámara del garaje "JJG Service" constituía prueba exculpatoria.

2. Incidió el Tribunal de Apelaciones al denegar la expedición del recurso, a pesar de que no hubo

---

[10] Apéndice de la petición de *certiorari,* págs. 152-153.

prueba de mala fe o conducta impropia del Estado en el manejo de la cinta de vídeo.

3. Incidió el Tribunal de Apelaciones al soslayar la normativa vigente sobre la materia. En particular el caso de *Arizona v. Youngblood*, 488 U.S. 51 (1988), que revocó el caso *People v. Harmes*, 560 P 2d 470, en el cual el Tribunal de Primera Instancia había fundamentado su decisión.

## II

Como se ha dicho, en nuestra jurisdicción el derecho del acusado al descubrimiento de prueba se rige por lo dispuesto en las Reglas de Procedimiento Criminal de Puerto Rico, específicamente las Reglas 94 y 95.[11] Sin embargo, existen instancias en las cuales el derecho al descubrimiento de prueba tiene una base más amplia, cimentada en la cláusula del debido proceso de ley de nuestra Constitución.[12]

**A.     *El deber constitucional de descubrir la evidencia exculpatoria***

En el normativo <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), caso citado por la ilustrada sala de instancia, el Tribunal Supremo de Estados Unidos estableció que el Estado tiene la obligación de descubrir toda evidencia favorable que sea relevante a la inocencia o castigo del acusado, independientemente de la buena o mala fe del Ministerio Público. En este caso se advierte que el

---

[11] 34 L.P.R.A. Ap. II.

[12] <u>Pueblo v. Arzuaga</u>, *supra*, pág. 534; <u>Pueblo v. Hernández García</u>, 102 D.P.R. 506, 511 (1974). En la jurisdicción federal, véase <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

incumplimiento por parte del Estado con relación a esta norma constituye una violación al debido proceso de ley consagrado en las Enmiendas Quinta y Decimocuarta de la Constitución federal.

Ahora bien, como parte del deber de descubrir, el Estado está obligado a preservar y entregar a la Defensa toda evidencia exculpatoria que advenga a su conocimiento o que recopile durante o con posterioridad al proceso investigativo.[13] En ese contexto, es menester recordar al Ministerio Público que como bien se implica en la definición que estableciéramos en Pueblo v. Echevarría Rodríguez, *supra*, evidencia exculpatoria no es necesariamente aquella que de por sí sola es capaz de producir la absolución del acusado. No se requiere tal potencial. Es más bien, toda evidencia que llanamente pudiera favorecer al acusado, sin consideraciones en torno a su materialidad o confiabilidad. Su confiabilidad -cuán creíble es-, así como su materialidad -cuánto aporta en favor del acusado-, es un asunto que corresponderá evaluar al foro de instancia.

Por otra parte, en Pueblo v. Hernández García, 102 D.P.R. 506 (1974), adoptamos lo resuelto en Brady v. Maryland, *supra*, y establecimos que el Ministerio Público está obligado a descubrir cualquier tipo de evidencia que sea relevante a la inocencia o el castigo del acusado, independientemente de que la evidencia en cuestión cumpla

---

[13] Pueblo v. Arzuaga, *supra*; California v. Trombetta, *supra*.

o no con los criterios establecidos en las Reglas de Procedimiento Criminal. Señalamos, entonces, que el incumplimiento con esta norma constituye una violación al debido proceso de ley constitucional.

Posteriormente, en Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243 (1979), un caso en el que la Defensa solicitaba unos informes que no se encontraban en posesión del Ministerio Público, "nos adherimos a la doctrina de Brady v. Maryland, ante y de United States v. Agurs, 427 U.S. 97 (1976), al puntualizar que 'es responsabilidad del Estado en su obligación de proveer un juicio justo bajo la cláusula de debido proceso de ley, y aun sin mediar solicitud de la defensa, revelar cualquier evidencia exonerante en su poder o vicios de falsedad en su prueba que de permanecer ocultos e ignorados sofocarían la verdad en la sala de justicia'".[14]

## B. Evidencia potencialmente exculpatoria

Ya hemos mencionado que prueba exculpatoria es, en síntesis, toda aquella que resulta favorable al acusado y que posee relevancia en cuanto a los aspectos de culpabilidad y castigo. De forma que si la evidencia en cuestión, por la razón que sea, no alcanza esas características, la misma no califica como prueba exculpatoria. Por otro lado, existen circunstancias en las que no es posible determinar la calificación de

---

[14] Pueblo v. Arzuaga, *supra*, págs. 536-537.

evidencia pertinente que el Estado no preservó. En otras palabras, situaciones en las que no es viable discernir si la evidencia pertinente recolectada por el Estado en la etapa investigativa **y que ya no existe**, obraba a favor o en contra del acusado. Tal tipo de evidencia se denomina evidencia "**potencialmente exculpatoria**". En el normativo Arizona v. Youngblood, 488 U.S. 51 (1988), el Tribunal Supremo federal estableció el parámetro mínimo con relación a un reclamo de debido proceso de ley, ante la pérdida de evidencia "potencialmente exculpatoria".

En Arizona v. Youngblood, *supra*, el Tribunal Supremo federal se enfrentó a la situación de un niño de diez años que fue brutalmente sodomizado. El día de los hechos y conforme al protocolo establecido, al menor se le tomó una muestra de material genético de su ano, para someterla al correspondiente examen de ADN. Además, se incautaron varias piezas de ropa del niño, aunque en ese momento no se les sometió a pruebas ni se preservaron con la diligencia debida. El problema surgió cuando el material genético tomado el día de los hechos en el cuerpo del menor no fue suficiente para poder realizar las pruebas de ADN. Entonces, el Estado intentó utilizar el material genético que se encontraba en la ropa incautada, encontrando que por su negligencia -al no refrigerarla- se habían estropeado las muestras y era imposible recuperarlas.

Ante esta situación, el acusado Youngblood planteó que el Estado había violado su debido proceso de ley al

ser negligente y no preservar la evidencia que podría favorecerle en su defensa. Sin embargo, el Tribunal Supremo federal no aceptó tal planteamiento. Ciertamente la Corte se encontraba ante una gran incertidumbre: de las piezas de ropa del niño haber sido preservadas diligentemente y habérsele realizado las pruebas de ADN, estas hubieran mostrado la identidad de la persona que había sodomizado al menor. De manera que en realidad esta evidencia podía exonerar al acusado, pero de igual manera podía inculparlo. Por eso, el Alto Foro federal determinó que las piezas de ropa no eran evidencia exculpatoria, sino potencialmente exculpatoria. Ante tal circunstancia, el Tribunal determinó que **a menos que el acusado pudiera demostrar que el Estado actuó de mala fe, el no preservar evidencia potencialmente exculpatoria no constituye una violación al debido proceso de ley**.[15] Como el acusado Youngblood no probó que las muestras se estropearon por la mala fe del Estado, el Tribunal concluyó que no se le había violado su derecho a un debido proceso de ley.

Situaciones como las de *Youngblood,* el propio Tribunal Supremo federal las había adelantado en California v. Trombetta, 467 U.S. 479, 486 (1984), al señalar que "cada vez que evidencia potencialmente exculpatoria se pierde permanentemente, los tribunales

---

[15] *"We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."* Arizona v. Youngblood*, supra,* pág. 58.

enfrentan la traicionera tarea de adivinar la importancia de materiales cuyo contenido es desconocido y, muy frecuentemente, disputado". Por otro lado, notemos que como habíamos mencionado, en <u>Brady v. Maryland</u>, *supra*, el Tribunal Supremo federal determinó que era irrelevante la buena o mala fe del Estado en la determinación de una violación del debido proceso de ley por no descubrir evidencia, cuando esta fuera evidencia exculpatoria. No obstante, en *Youngblood*, el parámetro no es el mismo por tratarse de evidencia no preservada a la cual no se le ha podido determinar valor exculpatorio, si alguno. Así que nos encontramos ante mera evidencia **potencialmente exculpatoria.**

Ahora bien, en *Youngblood,* el Tribunal Supremo federal no definió lo que constituía "mala fe" en el contexto de evidencia potencialmente exculpatoria. Aquellas jurisdicciones en las cuales la norma de *Youngblood* se ha adoptado han sido las que se han visto forzadas a definir el concepto. En general, en esas jurisdicciones se ha definido "mala fe" como **la actuación intencional o el esfuerzo consciente de un agente o funcionario del Estado de desaparecer la evidencia, buscando afectar así el resultado del proceso criminal.**[16]

El requisito de mala fe establecido en <u>Arizona v. Youngblood</u>, *supra*, ha recibido fuertes críticas,

---

[16] <u>State v. Kohel</u>, 320 Wis.2d 705 (2009); <u>State v. McGill</u>, 324 N.W.2d 378 (1982).

principalmente porque puede producir resultados no deseados.[17] Esto pues, en muchos casos resulta prácticamente imposible que en términos reales un acusado pueda demostrar la mala fe del Estado, sin conocer la razón que provocó la inaccesibilidad de la evidencia potencialmente exculpatoria. Una búsqueda de los casos en los que se ha tratado de probar la mala fe del Estado demuestra que en solo 7 de 1,675 se ha tenido éxito.[18]

Claro está, con relación al requisito de mala fe establecido en Arizona v. Youngblood, *supra*, es importante señalar que este es el mínimo que cada estado o territorio está obligado a reconocerle a un acusado. De manera que si el acusado logra probar que en la no preservación de evidencia potencialmente exculpatoria el Estado actuó con mala fe, procedería sin más su absolución.

**III**

Para poder determinar cuál será la norma a seguir en el supuesto de prueba **potencialmente exculpatoria**, es menester repasar primeramente cuáles han sido los parámetros que hemos determinado en casos de evidencia **exculpatoria**. Solo así podemos establecer los parámetros

---

[17] N. Bay, Old Blood, Bad Blood, And Youngblood: Due Process, Lost Evidence, And The Limits of Bad Faith, 86 Wash. U. L. Rev. 241 (2008); E. Bawden, Here Today, Gone Tomorrow- Three Common Mistakes Courts Make When Police Lose Or Destroy Evidence With Apparent Exculpatory Value, 48 Clev. St. L. Rev. 335 (2000); M. Lembke, The Role Of Police Culpability In Leon And Youngblood, 76 Va. L. Rev. 1213 (1990).

[18] Teresa N. Chen, The Youngblood Success Stories: Overcoming The "Bad Faith" Destruction of Evidence, 109 W. Va.L. Rev. 421 (2004).

coherentes con relación a una evidencia que por no ser exculpatoria exige un requerimiento mayor al acusado.

### *Materialidad de la prueba.*

En Pueblo v. Rodríguez Sánchez, *supra*, y fundamentándonos en United States v. Agurs, *supra*, introducimos por primera vez el elemento de materialidad de la prueba a descubrirse, al disponer que:

> [e]l concepto de materialidad, y la obligación del fiscal de revelar ante la solicitud de la defensa, han de ser consubstanciales con el eminente interés en asegurar que toda evidencia significativa que tienda a establecer inocencia sea presentada al juzgador de los hechos.[19]

Por otro lado, en Pueblo v. Arzuaga, 160 D.P.R. 520, 539 (2003), aclaramos el concepto de materialidad requerido en casos de evidencia exculpatoria al señalar, basándonos en Kyles v. Whitley, 514 U.S. 419, 434 (1995), y United States v. Bagley, 473 U.S. 667, 678 (1985), que:

> el Ministerio Fiscal tiene el deber de revelar cualquier indicio de falso testimonio y de descubrir evidencia exculpatoria cuando tal falsedad o carácter exculpatorio es, o debió ser, conocida por éste. Ello, naturalmente, sin necesidad de una previa solicitud por parte de la defensa y sin importar si las Reglas de Procedimiento Criminal proveen o no para tal descubrimiento en la etapa específica de los procedimientos en que se encuentren. El no hacerlo podría acarrear la **revocación de la convicción** y la celebración de un nuevo juicio. [Énfasis en el original] **Ello dependerá de la relevancia y materialidad de la evidencia suprimida; esto es, si la supresión de la evidencia de que se trata socava la confianza en el resultado del juicio. Esto deberá ser**

---

[19] Pueblo v. Rodríguez Sánchez, *supra*, pág. 247.

**analizado a base de un estándar de "probabilidad razonable".** (Énfasis suplido).

Como surge de nuestra jurisprudencia, en instancias en las que hemos evaluado la alegada violación al debido proceso de ley por incumplimiento del Estado en descubrir evidencia claramente exculpatoria, hemos sido consistentes en exigir que el acusado no solo demuestre que la evidencia le era favorable, sino que la misma era constitucionalmente material para su defensa. Esto, analizado a base de un estándar de probabilidad razonable. Siendo así, es claro que ese requisito de materialidad no podría ser sino el mínimo a exigirse en instancias como las del caso de autos.

*Negligencia del Estado como requisito en la alternativa.*

Por otro lado, limitar las posibilidades del acusado únicamente a la regla de *Youngblood*, o sea, a que tenga que probar la mala fe del Estado, lo entendemos cuando menos utópico, por la dificultad, sino imposibilidad, que esto representa. Además, es injusto, pues no debemos subestimar el hecho de que, como finalmente ocurrió con el propio Sr. Youngblood tal prueba, de haber sido debidamente preservada, tenía el potencial de favorecer o incluso exonerar al acusado.[20]

---

[20] Norman C. Bay, <u>Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith</u>, 86 Wash. U. L. Rev. 241 (2008).

Considerando lo anterior, en circunstancias en las que la evidencia no preservada por el Estado sea potencialmente exculpatoria, entendemos más justo y pragmático añadir un requisito en la alternativa al de mala fe del Estado; este es, **"negligencia"**. En este contexto, definimos "negligencia" como aquella circunstancia en la que el Estado haya fallado en ejercer el cuidado que una persona común ejercería.[21]

## A. *Análisis a seguir en el caso de evidencia no preservada*

En el caso de un reclamo de violación al debido proceso de ley por evidencia que no está disponible por no haber sido debidamente cuidada o preservada, el TPI deberá considerar los siguientes tres factores, en orden de prelación:(1) determinar que la evidencia no está disponible por una acción u omisión del Estado; (2) determinar que la evidencia constituía evidencia pertinente conforme se define en la Regla 401 de las Reglas de Evidencia de Puerto Rico;[22] y (3) determinar que, según la teoría de la Defensa, de estar disponible esta evidencia obraría a favor del acusado. Ahora bien, debemos recordar que **"evidencia potencialmente exculpatoria" no es evidencia exculpatoria que no está disponible.** Como ya hemos señalado, "evidencia potencialmente exculpatoria" es aquel tipo de prueba que

---

[21] Black's Law Dictionary, pág. 1057 (7th ed. 1999).

[22] 32 L.P.R.A. Ap. VI R. 401.

no está disponible y de la cual **no podemos determinar a ciencia cierta si hubiera obrado a favor o en contra del acusado**. Sin embargo, para que el acusado pueda cumplir con este tercer parámetro, tiene que poner al tribunal en posición de determinar, partiendo del supuesto de que hubiera sido exculpatoria, cómo esta prueba pudo haberle ayudado.

Además, en cuanto a este tercer factor propuesto y conforme al estándar de probabilidad razonable, evidencia "potencialmente exculpatoria" no significa aquella que hubiera producido la absolución del acusado, sino que hubiera sido suficiente como para minar o socavar la confianza en el resultado. Esta es una evidencia que de haberse presentado *a posteriori* hubiera llevado a pensar a una persona prudente y razonable que el fallo o veredicto, aunque podría sostenerse, "ya no es tan confiable".

### B. Análisis en caso de evidencia "potencialmente exculpatoria"

En los casos en los que el acusado plantee una violación al debido proceso de ley por la pérdida o destrucción de prueba potencialmente exculpatoria, el Ministerio Público debe exponer la razón de las circunstancias que lo llevaron a perder o destruir la evidencia en controversia. El acusado, a su vez, podrá presentar la evidencia que entienda pertinente y necesaria al asunto. De lo presentado, el tribunal

determinará si las actuaciones del Estado son constitutivas de mala fe o negligencia.

En los casos en que el tribunal encuentre que las actuaciones del Estado son constitutivas de mala fe, conforme hemos definido en esta Opinión, procedería la desestimación. Mientras que en los casos en que el tribunal entienda que el Estado fue negligente, será de aplicación una presunción a favor del acusado, según se establece en la 301(c) de las Reglas de Evidencia. Por su parte, cuando el Ministerio Público pruebe que sus acciones no se deben a la negligencia o mala fe, entonces el TPI determinará que no ha habido violación al debido proceso de ley.

**IV**

Pasemos, entonces, a resolver la controversia ante nuestra consideración. Según los hechos del caso, nos encontramos ante una aparente violación de la cláusula de debido proceso de ley, por el no descubrimiento por parte del Estado de evidencia no disponible; esto, por no haber sido debidamente cuidada o preservada. Siendo así, y conforme a los parámetros establecidos previamente, el primer paso es determinar si la evidencia se encontraba bajo la custodia y el control del Estado, y si bajo ese control se echó a perder, se destruyó o desapareció. No existe duda en cuanto a que el vídeo en cuestión, aunque no fue grabado por la Policía, una vez incautado estuvo en todo momento bajo el control del agente Pontón, de la

División de Robos, y que fue él quien regrabó otro material sobre la última copia viable que existía del mismo.

Con relación al segundo parámetro a determinar, tampoco existe duda en torno a que el referido vídeo hubiera constituido evidencia pertinente al caso. Como menciona el foro de instancia en su resolución, el vídeo constituía "una grabación tomada por las cámaras de seguridad del garaje JJG Service Station que grabaron visuales de lo ocurrido".[23] Es claro que ese vídeo constituía evidencia que hubiera cumplido con los parámetros de la Regla 401 de las Reglas de Evidencia, *supra.*[24]

El tercer punto a considerar es si la evidencia no disponible tiene el potencial, según la teoría de la Defensa, de favorecer al acusado. En el presente caso, aunque desde antes de la celebración de la vista preliminar el acusado estuvo reclamando que se le entregara el vídeo por ser uno "exculpatorio", lo cierto es que en aquel entonces no lo fundamentó, así como tampoco en sus múltiples mociones. No obstante, de las

---

[23] Apéndice de la Petición de *certiorari*, pág. 24.

[24] La Regla 401 de las Reglas de Evidencia, 32 L.P.R.A. Ap. VI R. 401, dispone:

> **REGLA 401. DEFINICIÓN DE EVIDENCIA PERTINENTE**
> Evidencia pertinente es aquélla que tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia. Esto incluye la evidencia que sirva para impugnar o sostener la credibilidad de una persona testigo o declarante.

actas de las vistas argumentativas se desprende que la Defensa fundamentó su solicitud del vídeo bajo el argumento de que sería para impugnar el testimonio del señor García Batista. Esto, ya que la identificación de su cliente se basaba en el testimonio del señor García Batista. La Defensa específicamente buscaba impugnar la interacción del testigo con el acusado y si este tuvo la oportunidad de observar la tablilla del vehículo. A estos efectos, en la *Minuta* de la vista de supresión de identificación del 27 de abril de 2011, la Defensa argumentó que solicitó el vídeo porque la intervención que se hizo con su cliente estaba basada en el número de tablilla que un testigo anotó el día de los hechos. Nueve días después, la policía intervino con el conductor del vehículo correspondiente a la tablilla anotada. La Defensa adujo que **la esencia de solicitar la supresión era precisamente suprimir la identidad, ya que el video no estaba disponible para corroborar si el testigo tuvo la oportunidad de anotar la tablilla por la brevedad de los hechos.**[25]

A los fines de atender la situación anterior, el TPI hizo constar que dicho vídeo no mostraba la tablilla del vehículo. La Defensa expresó que le preocupaba que se sustituyese el video por el testimonio de una persona que declararía que vio el auto, lo describa, ve la tablilla, la memoriza o la escribe y le brinda dicha información a

---

[25] Apéndice de la Petición de *certiorari*, pág. 121.

los agentes. Ahora bien, el tribunal determinó que puede que todo eso no esté en el vídeo pero sí el haber hecho la gestión de anotar la tablilla.[26]

Una vez satisfechos los requerimientos anteriores, para que el acusado pueda demostrar una violación al debido proceso de ley ante evidencia potencialmente exculpatoria, tiene que probar que el Estado obró de mala fe o, en su defecto, que actuó con negligencia. Por ello, toda vez que el TPI no celebró vista a estos fines y desestimó el caso, procede revocar los tribunales inferiores y devolver el caso al Tribunal de Primera Instancia para los procesos correspondientes conforme lo aquí resuelto.

**V**

Por todo lo anterior, se revocan las determinaciones de los foros *a quo* y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos conforme a lo aquí resuelto.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

---

[26] Íd.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.                  CC-2012-372     Certiorari

Omar Vélez Bonilla

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 30 de octubre de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revocan las determinaciones de los foros *a quo* y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos conforme a lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton, la Juez Asociada señora Rodríguez Rodríguez y la Jueza Asociada señora Pabón Charneco concurren con el resultado sin opinión escrita. El Juez Asociado señor Feliberti Cintrón está inhibido.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo